**WITTELS LAW, P.C.**
Steven L. Wittels
J. Burkett McInturff
Tiasha Palikovic
18 Half Mile Road
Armonk, New York 10504
Telephone: (914) 319-9945
Facsimile:  (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com
tpalikovic@wittelslaw.com

**THE ROTH LAW FIRM, PLLC**
Richard Roth
295 Madison Avenue, 22ND Floor
New York, New York 10017
Telephone: (212) 542-8882
Facsimile:  (212) 542-8883
rich@rrothlaw.com

*Attorneys for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **LORRAINE DAMATO, LOUIS MCLAUGHLIN, KATHLEEN MCNALLY, MICHAEL NASOFF, DIANA MANWARING, NATALIE LENETT, BLEU MARAQUIN, CHRIS YOOSEFI, GABRIEL BROOKS, AND ANGEL NIEVES,** | **No. 13 Civ. 994 (ARR) (VMS)** |
| **Individually and on Behalf of All Others Similarly Situated,** | *FIRST AMENDED CONSOLIDATED COMPLAINT FOR:* |
| **Plaintiffs,** | **(1) DECLARATORY JUDGMENT;** |
| | **(2) INJUNCTION; AND** |
| **v.** | **(3) CLASS ACTION RELIEF** |
| **TIME WARNER CABLE, INC.,** | |
| **Defendant.** | ***JURY TRIAL DEMANDED*** |

Plaintiffs Lorraine Damato, Louis McLaughlin, Kathleen McNally, Michael Nasoff, Diana Manwaring, Natalie Lenett, Bleu Maraquin, Chris Yoosefi, Gabriel Brooks, and Angel Nieves ("Plaintiffs"), by their undersigned attorneys, Wittels Law, P.C. and The Roth Law Firm, PLLC, sue in their individual and representative capacity, and on behalf of a class of persons defined below, against Defendant Time Warner Cable, Inc. ("TWC," "Time Warner Cable," or the "Company"), and hereby allege the following with knowledge as to their own acts, and upon information and belief as to all other acts:

### OVERVIEW OF TIME WARNER CABLE'S UNLAWFUL CONDUCT AND PROCEDURAL HISTORY OF THIS ACTION

1.      Plaintiffs bring this class action for a declaratory judgment, injunctive relief, and restitution to stop Defendant Time Warner Cable's breach of its customer contract and violations of various state consumer protection statutes.  In or around October 2012 TWC began charging millions of its customers a fee to "lease" the used modems already in their homes (the "Modem Lease Fee").  Prior to October 2012, the Company provided customers with internet modems at no additional cost and included the modems as part of consumers' monthly service plans.  As of October 2012, however, TWC began assessing an extra $3.95 per month for these old modems— used pieces of equipment that the Company itself installed in consumers' homes in the years prior to imposing the fee.

2.      To make matters worse, TWC has consistently raised the price of its Modem Lease Fee: first from $3.95 to $5.99 in mid-2013, then to $8 in late 2014, and most recently to $10 per month in 2016.  The Company has offered its customers no justification for these price hikes on old consumer electronic equipment that TWC wrote off as worthless years ago.

1

3.     TWC's binding customer contract, the Residential Services Subscriber Agreement (hereafter the "Subscriber Agreement" or "contract"),[1] forbids TWC from charging for the used modems already in consumers' homes.  The plain language of TWC's contract is reinforced by TWC's 18+ year course of dealing where it provided modems as part of consumers' internet service plans.  Indeed, TWC's own internal customer service scripts circulated prior to the fee's imposition demonstrate that TWC understood that the new charge was going to be "surprising" to its customers.

4.     TWC's imposition of the Modem Lease Fee also violates the implied covenant of good faith and fair dealing because TWC *knew* that the majority of its customers did not have the technical knowhow to avoid the fee and would feel intimidated by the prospect of buying their own modem and hooking it up to TWC's network.  This cumbersome process requires consumers to login to their cable modem's network administration console to make configuration changes, troubleshoot and eventually replace the TWC modem.

5.     The reasons TWC gave consumers for imposing the fee are also *false*.  In October 2012, TWC told consumers that the fee was to (i) support improvements in TWC's internet speeds and (ii) to pay for increased customer service costs.  Yet TWC assessed the fee on consumers nationwide *for years* before improving speeds in only a few select markets.  To date, almost four years after TWC first began charging the Modem Lease Fee, millions of its customers have seen no increase in internet speeds.  Further, upon information and belief the increase in TWC's customer service costs attributable to modems is far lower than the billions of dollars in Modem Lease Fees TWC has collected, and will continue to collect from Plaintiffs and the Class.  The true purpose of the fee was exposed by the Wall Street Journal:  support the price of TWC's shares amid the decline in cable television subscribers.

---

[1] The Subscriber Agreement is attached as Ex. A.

6.      Prior to implementing the fee TWC also knew that many of its customers were on promotional pricing plans with set prices and that these customers thought the cost of the modem was included in the previously agreed upon package.  Under the Subscriber Agreement, TWC had "assured" customers that their prices would remain fixed during the promotional period. Notwithstanding these consumers' reasonable expectations and TWC's contractual commitment to honor its promotions, TWC levied the Modem Lease Fee on these customers as well.

7.      Finally TWC's conduct violates the consumer protection laws of New York, New Jersey, and California.  TWC's Modem Lease Fee is unfair, unconscionable, and TWC has made various material misrepresentations and omissions, including calling the fee an "Internet Modem Lease" on consumers' bills when in fact the fee is simply a rate increase that bears no reasonable relationship to TWC's actual modem costs.  TWC also failed to inform consumers that it knew the majority of them would not feel they had the technical expertise necessary to avoid the fee and that the fee is grossly in excess of the value of the used modems already in consumers' homes.

### Prior Arbitration Awards in Plaintiffs' Favor

8.      The first nine Representative Plaintiffs in this action filed a Consolidated Class Action Complaint on February 27, 2013 for both injunctive and non-injunctive type relief. Thereafter, the Honorable Allyne R. Ross ordered all nine Plaintiffs to arbitrate their damages claims, which were completed in the spring of 2016.

9.      Plaintiffs Diana Manwaring and Louis McLaughlin won awards in their favor.  In the *Manwaring* Award, the Arbitrator awarded Plaintiff the total Modem Lease Fees she paid plus interest "based on the claim that TWC breached the parties' contract by overcharging her after offering her a promotional arrangement for a two year period."  *Manwaring* Award incorporated herein by reference.  In the *McLaughlin* Award, the Arbitrator awarded Mr.

3

McLaughlin $1,936.39 after finding that although TWC's contract allowed the Company to charge for "new or additional equipment . . . the subject modem [ ] was neither new nor additional at the time the modem [lease] fee was imposed . . . ." *McLaughlin* Award incorporated herein by reference. Further, the *McLaughlin* arbitrator ruled that TWC had "provided Claimant with the subject modem without additional charge for approximately six years after Claimant first subscribed to Respondent's service." *Id*.

      10.     The *McLaughlin* Arbitrator also ruled that:

> [I]t is clear from the parties' conduct, specifically Respondent's failure to charge any [modem] license fee for several years after providing the subject modem, and the language of the Subscription Agreement, that both parties, at the time they entered into the Subscription Agreement, intended that Respondent provide Claimant with the use of the subject modem (which was neither new nor additional at the time the modem license fee was imposed) without additional charge. *Id*. at 2.

**Summary of Claims in this Court**

      11.     The Arbitration Awards for Ms. Manwaring and Mr. McLaughlin show the merit of the claims that all the first nine Plaintiffs and additional New York Representative Plaintiff Angel Nieves now bring in this Court. These claims are specifically authorized by Judge Ross' July 31, 2013 Opinion which states that "claims for injunctive orders or similar relief must be brought in a court." ECF No. 20 at 4. In construing TWC's arbitration clause in the Subscriber Agreement, Judge Ross held that this clause "clearly prohibits either side from arbitrating claims for injunctive or similar relief," (*id*. at 16), and further clarified that "the plain meaning of the arbitration clause exempts claims for injunctive relief from arbitration." *Id*. at 26.

      12.     Accordingly, this First Amended Consolidated Complaint seeks, *inter alia*:

> a. A declaratory judgment that TWC breached its contract with its internet customers, and/or violated various state consumer protection statutes, by (a) imposing the lease fee on used modems in violation of numerous provisions of the Subscriber Agreement, (b) charging more than allowed by customers' set promotional price plans, (c) charging exorbitant sums for equipment that has virtually no value, (d) imposing the fee despite recognizing that the vast

majority of its customers would not take the steps necessary to avoid the fee, and (e) charging customers for modems they already owned;

b. Restitution to the proposed Class of customers charged the Modem Lease Fee to remedy TWC's unjust enrichment, and unfair and unlawful conduct; and

c. An injunction preventing TWC from continuing to impose the Modem Lease Fee on customers who had TWC modems in their homes when TWC instituted the charge.

13.     The actionable harms arising from Time Warner Cable's Modem Lease Fee

practices include without limitation the following unlawful acts:

a. TWC breached the Subscriber Agreement because the contract permitted TWC to charge a lease fee *only* on "new or additional equipment," not the used modems already in consumers' homes (¶3(a));

b. TWC breached the Subscriber Agreement's explicit promise by TWC that "[w]e provide you with a cable modem[,]" (¶5(g));

c. TWC violated its 18-year course of dealing with customers, which is conclusive evidence that when TWC undertook in the Subscriber Agreement to "provide you with a cable modem," (¶5(g)) Defendant undertook to not charge its existing customers for old modems that TWC itself had installed in consumers' homes in the years prior to imposing the fee;

d. TWC breached the implied covenant of good faith and fair dealing by charging a fee that contravened consumers' reasonable contractual expectation that the modems' cost was included as part of their internet service price;

e. TWC breached the implied covenant of good faith and fair dealing by imposing the fee in bad faith, which is evidenced by TWC's recognition that (a) most existing customers would not attempt to avoid the fee because these consumers would be intimidated by the complicated steps necessary to install their own modem, (b) existing customers would find the fee "surprising," (c) the reasons TWC gave consumers for implementing the fee were false, and (d) consumers on fixed promotional price plans would think that the modem was included in the promotional rate.

f. TWC breached the Subscriber Agreement because it increased the cost to customers who were on fixed promotional price plans and were contractually "assured . . . that [they] will be charged the set price during the time specified." (¶3(a));

g. TWC violated various state consumer protection laws prohibiting unfair, unconscionable, and deceptive conduct by (a) calling the charge a "Modem Lease Fee" when in fact both TWC's President and its former CFO publicly

5

acknowledged that the charge was simply a "rate hike," (b) calling the charge a "Modem Lease Fee" when the stated purpose of the fee was to garner funds to enhance the Company's infrastructure and to offset allegedly increased customer service costs, (c) charging a Modem Lease Fee that bears no reasonable relationship to TWC's actual modem costs, (d) continuing to raise the price of the Modem Lease Fee on used modems that *lose* value each year and that TWC wrote off years ago, (e) giving consumers false justifications for the Modem Lease Fee, (f) assessing the fee nationwide for years before improving speeds in only a few markets and leaving millions of its customers to pay the fee without improved internet service, (g) failing to inform consumers that TWC knew the majority of its customers would be intimidated by the technical difficulties of buying and installing their own modem, (h) failing to inform consumers that the Modem Lease Fee is grossly in excess of the used modems' fair market value, and (i) charging the Modem Lease Fee when it knew its customers would find the fee "surprising" and that customers on promotional plains would expect that the cost of the modem was included in the promotional rate.

14.     Plaintiffs ask the Court to enjoin TWC from continuing the Modem Lease Fee and require that Defendant modify its Modem Lease Fee practices, subsequently making this modification binding on all necessary parties by service of notice pursuant to Federal Rule of Civil Procedure 65.

15.     Plaintiffs also sue to stop TWC from continuing to charge the fee on customers who still have their old modems in New York, New Jersey, and California, as well as the 26 other states where Time Warner Cable has internet customers.[2]

16.     Only through this action can the Company's customers remedy TWC's misconduct.  Because it is uneconomical for consumers to challenge the lease fees on an individual basis, as the fees extracted by the Company are small compared to the much higher cost a single customer would incur in trying to challenge TWC's conduct, it makes no financial sense for an individual customer to contest the fee.  Thus, this suit holds out the only remedy available.  With this action, TWC's customers seek to level the playing field, and make sure that companies like TWC engage in fair and upright business practices.

---

[2] http://www.timewarnercable.com/en/our-company/company-overview.html (last visited July 31, 2016).

17. Plaintiffs therefore request that this Court declare the Modem Lease Fee impermissible, enjoin TWC from continuing its Modem Lease Fee, and require that TWC make restitution to Plaintiffs and the Class of all unlawful Modem Lease Fees thus far collected.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because the aggregate claims of the Class exceed the sum or value of $5,000,000.00, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendant.

19. This Court has personal jurisdiction over Defendant because it maintains sufficient contacts in this jurisdiction, including the advertising, marketing, distribution, and sale of cable services in this jurisdiction.

20. Defendant's Subscriber Agreement specifies that claims for an injunction or similar relief must be brought in a court.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) & (2). Substantial acts in furtherance of the alleged improper conduct occurred within this District. Plaintiffs Lorraine Damato, Louis McLaughlin, and Angel Nieves reside within this District and have subscribed to Defendant's internet services within this District.

## PARTIES

22. Plaintiff Lorraine Damato is a resident of Queens, New York and was a Time Warner Cable customer when TWC imposed the Modem Lease Fee. Ms. Damato is not currently a TWC customer but due to the few options in her neighborhood for cable service she is considering becoming a TWC customer again. Before October 15, 2012, Defendant never billed her separately for the modem.

7

23.     Plaintiff Louis McLaughlin is a resident of Brooklyn, New York and has been a Time Warner Cable customer since approximately 2004.  Before October 15, 2012, Defendant never billed him separately for the modem.

24.     Plaintiff Kathleen McNally is a resident of New York, New York. Plaintiff Kathleen McNally has been a Time Warner Cable customer for more than twenty (20) years.  Her Company-supplied internet cable modem was manufactured in 2004.   An image of Plaintiff McNally's modem is below.



Before October 15, 2012, Defendant never billed Plaintiff McNally separately for the modem.

25.     Plaintiff Michael Nasoff is a resident of New York, New York.  Plaintiff Michael Nasoff was a Time Warner Cable customer for more than eight years.  During that entire time, he has had a Company-supplied internet cable modem.   Before October 15, 2012, Defendant never billed him separately for the modem.

26.     Plaintiff Diana Manwaring is a resident of Pulaski, New York and was a Time Warner Cable customer when TWC imposed the Modem Lease Fee.  Her Company-supplied internet cable modem was manufactured in 2007.   In April 2012, Ms. Manwaring was offered a two-year set price "promotional" rate for the "All the Best" package, which includes cable television, digital home phone and standard internet.  The promotional rate also included a digital video recorder service.  Defendant did not replace Plaintiff Manwaring's modem when she accepted Defendant's promotional offer.  Rather, Plaintiff Mainwaring continued to use the 2007 company-supplied modem.  Before October 15, 2012, Defendant never billed her separately for the modem.

27.     Plaintiff Natalie Lenett is a resident of Fort Lee, New Jersey.  The bills from Time Warner Cable for her triple play service are sent to Ms. Lenett's husband Louis, however, Ms. Lenett is responsible for paying the bills.   Before October 15, 2012, Defendant never billed her separately for the modem.

28.     Plaintiff Bleu Maraquin is a resident of Redlands, California and has been a Time Warner Cable customer since 2008.  Ms. Maraquin's modem was installed on December 18, 2008.  An image of Plaintiff Maraquin's modem is below.



Before October 15, 2012, Defendant never billed Plaintiff Maraquin separately for the modem.

29.     Plaintiff Chris Yoosefi is a resident of Valley Village, California and has been a Time Warner Cable customer since 2009.  Mr. Yoosefi purchased internet service from TWC under a 12-month set price promotional rate.  Before October 15, 2012, Defendant never billed him separately for the modem.

30.     Plaintiff Gabriel Brooks is a resident of Panorama City, California and was a Time Warner Cable customer with a Company-provided modem for approximately three years before the new charge was implemented.  Before October 15, 2012, Defendant never billed him separately for the modem.  Mr. Brooks is no longer a TWC customer.

31.     Plaintiff Angel Nieves is a resident of Queens, New York and is a Time Warner Cable customer.  Mr. Nieves has used the same modem in his home since approximately 2004. Before October 15, 2012, Defendant never billed him separately for the modem.  An image of Plaintiff Nieves' 12 year old modem is below.



32.     Defendant Time Warner Cable, Inc. is a Delaware corporation headquartered in New York City, where it also maintains its executive offices.  Its businesses include interactive

services, cable systems, filmed entertainment, television networks and publishing. Defendant provides service to subscribers in 29 states, including New York, New Jersey, and California. Upon information and belief, all important decisions regarding its services are made in New York, including the decision to impose and implement the Modem Lease Fee.

## FACTUAL ALLEGATIONS

**A.      Time Warner Cable's Modem Lease Fee**

33.      With more than 50,000 employees, Defendant Time Warner Cable is the second largest cable provider in the country.  It describes itself as "among the largest providers of video, high-speed data and voice services in the United States, connecting 16 million customers to entertainment, information and each other." Company Overview – Our Reach*, available at*: http://www.timewarnercable.com/en/our-company/company-overview.html; (last visited July 31, 2016).

34.      For a Company with more 16 million customers (including more than 10.8 million using inernet), the extra $10 Modem Lease Fee guarantees TWC nearly a billion dollars a year in added revenue.  This is in addition to the more than $1 billion the Company has already collected in Modem Lease Fees during the past 3+ years.

**B.      The Purpose of the Modem Lease Fee**

35.      TWC has never viewed the Modem Lease Fee as a fee related to modems.  TWC spokesperson Dave Borchardt stated publicly:

> We are continually investing in our network to insure the fastest, most reliable internet service for our customers.  **The new fee will help support these ongoing infrastructure improvements and service enhancements**.

*Time Warner to Start Charging Modem Fee*, Lincoln Journal Star, Oct. 4, 2012, *available at:* http://journalstar.com/business/local/time-warner-to-start-charging-modem-

11

fee/article_4808f902-5aed-59fb-b6f2-780fd1719733.html  (last visited July 31, 2016) (emphasis added).

36.      In early December, 2012, then TWC CEO Glenn Britt told attendees at a UBS conference in New York that the Modem Lease Fee is "**essentially a price increase**" for broadband service.  *Time Warner Cable to expand usage-based broadband billing options nationwide*, FIERCECABLE, Dec. 3, 2012, *available at:* http://www.fiercecable.com/story/time-warner-cable-expand-usage-based-broadband-billing-option-nationwide/2012-12-03 (last visited July 31, 2016) (emphasis added).  In other words, customers aren't leasing anything, but rather paying for the Company's operating costs.

37.      With these admissions about the true reason for the then new $3.95 fee, Time Warner Cable's own leadership underscores the deceptive nature of the sudden and thinly-veiled price hike.  The Modem Lease Fee is not a lease fee at all, but a plain and simple monthly service increase designed increase company revenue.  Indeed, by calling the fee an "Internet Modem Lease" fee, TWC suggests that the fee is just a pass through of the cost to TWC of supplying and maintaining the modem.  In fact, however, the Modem Lease Fee is a source for substantial additional revenue.

38.      A 2013 Wall Street Journal analysis showed that TWC's revenues from the fee were "so large that it means Time Warner Cable could buy each of its roughly 11 million residential broadband customers a new modem each and every year (assuming they cost about $60 each wholesale)."  *About That Time Warner Cable $5.99 'Modem Lease' Fee*, THE WALL STREET JOURNAL, July 31, 2013, *available at:* http://blogs.wsj.com/corporate-intelligence/2013/07/31/about-that-time-warner-cable-5-99-modem-lease-fee (last visited July 31, 2016).  Rather than relating to the actual modems or even TWC's capital expenditures, the Wall Street Journal's analysis found that the fee's purpose was "to feed a growing line of

dividends and stock buybacks — these are mechanisms for keeping the stock price up. And that keeps Wall Street happy." *Id.*

39. When TWC instituted the fee it also took steps to conceal the fee. In furtherance of its attempt to quietly raise rates, TWC sent some customers a nondescript two-sentence postcard mentioning the lease fee. The postcard, however, was indistinguishable from junk mail. Other Class members were given no notice at all. For other customers, namely some customers in Ohio and California, TWC sent no postcard, only including a similarly nondescript two-sentence blurb about the Modem Lease Fee on those customers' October 2012 bill.

**C.      Time Warner Cable Violated its Promise That it Would Only Charge Lease Fees for New or Additional Equipment**

40. TWC's Modem Lease Fee also violates its binding contractual promise that customers will be required to lease only "new or additional equipment." Because the used modems are not "new or additional equipment," Defendant is barred from charging Plaintiffs and the Class an additional fee to lease them.

41. The relevant provision of the Subscriber Agreement states:

> The **Services** we provide and the way we deliver them will change from time to time, in part due to our efforts to improve them. These changes may impact the **Services** you receive today, or may require that you change your own equipment or its configuration, **or lease new or additional Customer Use Equipment from us**, to continue to obtain the full benefit of those Services. If you are under a promotional or other offering with a set price for a period of time, you are assured only that you will be charged the set price during the time specified. You are not assured that the Services you receive (or that our equipment and system requirements) will remain the same.

Ex. A, Subscriber Agreement at ¶3(a) (emphasis added).

42. The old modems TWC put in consumers' homes in the years prior to the Modem Lease Fee are not "new or additional" equipment. Further, TWC did not change in any way "[t]he **Services** we provide and the way we deliver them[,]" which is a contractual precondition for requiring consumers to lease "new or additional" equipment. Similarly, TWC did not satisfy

13

the precondition that there be an "impact [on] the **Services** you receive" such that in order "to obtain the full benefit" of TWC's internet service consumers needed to lease a new modem. There was no service change.  TWC simply started charging consumers for the modems already in their homes.

### D. TWC Violated its Promise Not to Charge for Modems

43.     Modems are necessary for TWC subscribers like Plaintiffs and the Class to connect to the internet.  And as part of TWC's bargain with its customers in the Subscriber Agreement, TWC agreed to provide modems at no additional charge.  Defendant's Modem Lease Fee, however, violates this binding contractual promise.

44.     TWC's Subscriber Agreement states "**[w]e provide you with a cable modem**." Ex. A, at ¶5(g) (emphasis added).  TWC is not allowed to charge a fee for the old modems they put in consumers' homes years ago, as the Subscriber Agreement has no terms permitting TWC to require consumers to lease used equipment already installed in the customer's home.

45.     The Subscriber Agreement defines the Company-provided modem as "**Customer Use Equipment**," stating:  "Customer Use Equipment means . . . the cable modems, remote controls and other pieces of equipment **that we provide to you** for use inside your premises to receive the **Services**."  *Id*. at ¶16(d) (emphasis added).

46.     By contrast, the "**Services**" TWC customers purchase are defined as "video, high speed data, wireless data and Digital Home Phone services, as well as equipment-based services like DVR service."  *Id*. at ¶16(l).  Modems are "equipment," not "services."

47.     The Subscriber Agreement does not permit TWC to charge "Equipment" fees once the equipment is in the customers' possession.  The contract only allows TWC to change the price for its "services" – not "equipment."  Paragraph 8(a) of the Subscriber Agreement states "we may change the prices for our **services** or the manner in which we charge for them."

14

(Emphasis added).  Because Company-provided modems are not a "service," TWC also breaches its customer contract by charging the Modem Lease Fee, which is an **equipment** lease fee.

> **E.     The Modem "Lease" Fee is Excessive and Bears No Relationship to the Negligible Value of the Used Modems or TWC's Actual Modem Costs**

48.     With its "lease" fee on old internet modems, TWC is charging exorbitant financing rates for equipment that has little to no present value.  Moreover, upon information and belief, years ago the Company wrote off the value of most of the modems it supplied.

49.     Despite the negligible value of customers' old modems, TWC nonetheless decided to charge established customers a fee that has gone from $3.95 up to $10 per month for used equipment that is in many instances virtually worthless or without any re-sale value.  As a result of the Modem Lease Fee, many TWC customers quickly ended up paying more than the present value of their modems.  For example, for almost four years Defendant has been charging Plaintiff Angel Nieves for a 12+ year old Company-supplied modem that was manufactured in 2004 and that has almost no monetary value.

50.     The new "lease" fee is completely arbitrary and has no relationship to the actual value of the old modems in people's homes.  This is underscored by the fact that in 2012 TWC charged new customers who signed up for cable service only $2.50 a month for new modems, but then charged established customers $3.95.  Certainly, the modems TWC supplied to new customers were worth more than the old equipment—yet TWC chose to gouge its already established customers.  TWC's ever-increasing fee from $3.95, to $5.99, to $8, and now $10, betrays the real purpose of the modem fee:  disguised revenue.

51.     Given the present value of TWC's used modems, TWC's Modem Lease Fee saddles customers with effective finance rates that can range between 100% and 300%—an excessive and unconscionable rate.

52.     TWC's Modem Lease Fee also far exceeds the Company's actual modem-related costs.  TWC's supposed justifications for the fee illustrate how the fee is excessive.  TWC told consumers when the fee was implemented that it needed the funds to invest in infrastructure and to offset increased customer service costs.  Infrastructure costs are not properly considered part of the cost of leasing a modem.  In addition, TWC made customers pay the fee for years before increasing internet speeds in only a few select markets.  TWC continues to bill consumers to lease their modems even though TWC has not increased these customers' internet speeds.  Further, the increase in TWC's customer service costs attributable to the modems is far lower than $1 billion+ in Modem Lease Fees TWC is now collecting annually.

**F.     Time Warner Cable Wrongfully Assesses the Modem Lease Fee on Customers Who Own Their Own Modems**

53.     Upon information and belief, many thousands of TWC customers (or more) previously purchased and owned their own internet modems before TWC began charging for company-supplied modems.  TWC knows, or should know which of its customers own their own modems.  Nonetheless, since on or about October 15, TWC has been wrongfully charging customers the Modem Lease Fee to "lease" equipment they already own.

54.     To add insult, even after customers inform TWC that it has no right to charge them a "lease" fee on equipment the customer owns, TWC continues to charge the fee.  TWC puts the onus on customers to "prove" they own their modems when TWC has internal records which show, or should show, that the modem is not a company-supplied piece of equipment.

55.     TWC's policy of charging customers to "lease" a modem they already own is both unconscionable and in violation of the Subscriber Agreement.

**G.     Time Warner Cable Violated the Terms of its Promotional Set Price Plans**

56.     Defendant TWC has entered into promotional set price plans with many of its customers.   Under these plans, TWC agreed not to raise the customers' rates for a specified period of time.

57.     Paragraph 3(a) of the Subscriber Agreement states:

> **If you are under a promotional or other offering with a set price for a period of time, you are assured only that you will be charged the set price during the time specified**.

Ex. A.

58.     In violation of these set price plans, TWC raised its prices and has been charging these customers to lease their internet modems since on or about October 15, 2012.

59.     New York Plaintiff Diana Manwaring had a set price plan from TWC since approximately May 2012 that locked in her price for equipment and services—including the modem—for two years.

60.     California Plaintiff Chris Yoosefi had a set price plan from TWC since approximately January 2012 that locked in his price for equipment and services—including the modem—for a year.

61.     TWC's new policy of charging customers with set price plans an additional fee to "lease" their modems is both unconscionable and in violation of TWC's Subscriber Agreement.

**H.     TWC Violated its Duty of Good Faith and Fair Dealing**

62.     Defendant TWC has violated its contractual duty of good faith and fair dealing with Plaintiffs and the Class by, among other things, (i) ignoring the long-standing course of dealing with its customers under which it never charged any fee for modems; (ii) calling its modem charge a "lease fee" when in reality the fee is simply a rate hike, (iii) charging established customers an exorbitant fee for old equipment, and then continually raising the cost

17

of the modem without any reasonable basis or justification, (iv) abusing its power to specify the terms of the Subscriber Agreement; and (v) increasing the costs of customers' promotional fixed rate plans by charging a Modem Lease Fee.

63.     The fact that TWC may have based its decision to separately charge for modems on alleged increases in customer service costs does not eliminate TWC's obligation to exercise its discretion in a manner that respects Plaintiffs' rights and expectations under the parties' contract.   TWC knew before implementing the Modem Lease fee that the majority of its customers would not attempt to avoid the fee because these consumers would be intimidated by the complicated steps necessary to install their own modem.   TWC also knew that existing customers would find the fee "surprising" and that customers on promotional price plans would think that the modem was included in the promotional price.   In fact, TWC prepared customer service training manuals to help its representatives hold back the wave of customer complaints Defendant knew it would receive once customers learned of the new fee.   For example, in an internal training memorandum about the impending fee TWC instructed its representatives to acknowledge customers' frustrations, "stay calm and empathetic," and "allow the customer to vent."

64.     Further evidence of bad faith is the fact that the reasons TWC gave for imposing the fee (infrastructure costs and increased customer service costs) are false.

65.     Even if a purported reason for the Modem Lease Fee is to provide consumers with better internet service, this was not true for Plaintiffs and most customers, as TWC waited *years* to improve service for Plaintiffs, and did so only in a few select geographical regions.   TWC's unilateral imposition of the fee deprived Plaintiffs of the bargain they made with TWC and was undertaken to benefit TWC at Plaintiffs' expense.   TWC breached its duty of good faith and fair

18

dealing in requiring Plaintiffs and millions of TWC's other customers to lease the used modems

TWC itself had put in consumers' homes in the years prior to instituting the Modem Lease Fee.

## CLASS ACTION ALLEGATIONS

66.     Plaintiffs sue on their own behalf and on behalf of a Class under Rules 23(a),

(b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

67.     The Class is preliminarily defined as all customers who were charged an "Internet

Modem Lease Fee" on existing modems in place as of October 1, 2012 to the date of judgment

(which modems were not replaced or upgraded) in (i) New York, New Jersey, and California,

and (ii) all other states where TWC does business (the "Multistate Class" and "Class Period"

respectively).

68.     As to Rule 23(b)(2), Plaintiffs, on their own behalf and on behalf of the Multistate

Class, seek injunctive and declaratory relief.

69.     Plaintiffs also sue on behalf of subclasses of all customers in (i) New York, New

Jersey, and California, and (ii) all other states where TWC does business who were provided

services from Defendant pursuant to an agreement that Defendant would charge a promotional or

set price for its services, but have been charged a fee by Defendant for leasing a Company-

provided modem during the Class Period (the "Set Price Subclass").

70.     Plaintiffs also sue on behalf of subclass of customers in (i) New York, New

Jersey, and California, and (ii) all other states where TWC does business who were assessed the

Modem Lease Fee despite owning their own modems (the "Owner Subclass").

71.      Plaintiffs Damato, McLaughlin, McNally, Nasoff, Manwaring and Nieves also

sue on behalf of a subclass of New York residents who have been charged a fee by Defendant in

violation of New York General Business Law § 349 for leasing a Company-provided modem

during the Class Period (the "New York GBL Subclass").

19

72.     Plaintiff Lenett also sues on behalf of a subclass of New Jersey residents who have been charged a fee by Defendant in violation of the New Jersey Consumer Fraud Act for leasing a Company-provided modem during the Class Period (the "New Jersey CFA Subclass").

73.     Plaintiffs Maraquin, Yoosefi, and Brooks also sue on behalf of a subclass of California residents who have been charged a fee by Defendant for leasing a Company-provided modem in violation of the California Consumers Legal Remedies Act and California's Unfair Competition Law during the Class Period (the "California Subclass").

74.     Excluded from the Class and Subclasses are officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, and their legal representatives, heirs, successors or assigns and any entity in which they have or have had a controlling interest.  Also excluded are all federal, state and local government entities; and any judge, justice, or judicial officer presiding over this action and the members of their immediate families and judicial staff.

75.     This action has been brought, and may properly be maintained as a class action against Defendant, pursuant to Federal Rule of Civil Procedure 23.

76.     Plaintiffs do not know the exact size of the Class and Subclasses (hereafter collectively the "Class" unless otherwise specified), since such information is in the exclusive control of Defendant.  Plaintiffs believe, however, that based on the number of TWC internet subscribers, the Class encompass many millions of individuals whose identities can be readily ascertained from Defendant's records.  Plaintiffs also believe each subclass has many hundreds of thousands (if not millions) of members.  Accordingly, the members of the Class are so numerous that the joinder of all such persons is impracticable.

77.     Plaintiffs' are adequate class representatives.  Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class.

Both Plaintiffs and the other members of the Class were subject to the same or similar conduct that is governed by TWC's standard Subscriber Agreement.  Further, Plaintiffs and members of the Class sustained substantially the same injuries arising out of Defendant's conduct.

78.     Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have retained competent and experienced class action attorneys to represent their interests and those of the Class.

79.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

    a.     Whether Defendant breached the terms of the Subscriber Agreement;

    b.     Whether Defendant violated its duty of good faith and fair dealing under the Subscriber Agreement;

    c.     Whether Defendant was unjustly enriched as a result of its conduct, and must make restitution to Plaintiffs and the Class;

    d.     Whether Defendant's conduct constitutes unfair, unconscionable, unlawful, or deceptive practices prohibited by the laws of New York, New Jersey, and California;

    e.     Whether Defendant's conduct injured consumers and, if so, the extent of the injury; and

    f.     Whether, and to what extent, equitable relief should be imposed on Defendant.

80.     A class action is superior to all other available methods for resolving this controversy because i) the prosecution of separate actions by Class members will create a risk of adjudications with respect to individual Class members that will, as a practical matter, be dispositive of the interests of the other Class members not parties to this action, or substantially impair or impede their ability to protect their interests; ii) the prosecution of separate actions by Class members will create a risk of inconsistent or varying adjudications with respect to

individual Class members, which will establish incompatible standards for Defendant's conduct; iii) Defendant has acted or refused to act on grounds generally applicable to all Class members; and iv) questions of law and fact common to the Class predominate over any questions affecting only individual Class members.

81.     Accordingly, this action satisfies the requirements set forth under Federal Rules of Civil Procedure  23(a), 23(b)(2), and 23(b)(3).

**COUNTS**

**COUNT I: DECLARATORY JUDGMENT**

**(ON BEHALF OF (A) NEW YORK, NEW JERSEY, AND CALIFORNIA CUSTOMERS, AND (B) CUSTOMERS IN ALL OTHER STATES WHERE THE COMPANY OPERATES)**

82.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

83.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Multistate Class defined above.

84.     Defendant's Subscriber Agreement states that "**claims for injunctive orders or similar relief <u>must</u> be brought in a court**."  Ex. A, ¶15(b) (emphasis added).  Thus, TWC has agreed that this Court is the proper forum to decide whether declaratory relief is appropriate.

85.     The Declaratory Judgment Act, 28 U.S.C. § 2201, states that the "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

86.     Plaintiffs seek a declaratory judgment, *inter alia*, that:

    a.  Defendant violated its Subscriber Agreement by charging the Modem Lease Fee on modems that are not "new" or "additional" equipment;

22

b.  Defendant breached its duty of good faith and fair dealing in charging the Modem Lease Fee;

c.  Defendant may not charge customers with promotional, set price rate plans a Modem Lease Fee;

d.  Defendant has been unjustly enriched and must make restitution to Plaintiffs and the Class;

e.  Defendant may not charge customers who own their own modems a Modem Lease Fee; and

f.  Defendant violated the consumer protection laws applicable to Plaintiffs and the Class.

## COUNT II: INJUNCTION

### (ON BEHALF OF (A) NEW YORK, NEW JERSEY, AND CALIFORNIA CUSTOMERS, AND (B) CUSTOMERS IN ALL OTHER STATES WHERE THE COMPANY OPERATES)

87.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

88.     Plaintiffs seek an injunction to prevent Defendant TWC from continuing its Modem Lease Fee practices that are causing irreparable injury to Plaintiffs and the Class.

89.     Defendant's Subscriber Agreement states that "claims for injunctive orders or similar relief must be brought in a court." Ex. A, ¶15(b) (emphasis added). Thus, TWC has agreed that this Court is the proper forum to decide whether injunctive relief is appropriate.

90.     Under the injunctive authority vested in this Court by Fed. R. Civ. P. 65, various state consumer protection statutes, and stipulated by Defendant TWC's Subscriber Agreement, Plaintiffs maintain that an injunction is warranted to stop Defendant's ongoing breach of contract, breach of its duty of good faith and fair dealing, unjust enrichment, and unconscionable, unfair, and deceptive practices which harm its customers, are directed at Plaintiffs and other similarly situated consumers, and are in violation of New York, New Jersey, and California consumer protection laws.

23

## COUNT III: BREACH OF CONTRACT

**(ON BEHALF OF (A) NEW YORK, NEW JERSEY, AND CALIFORNIA CUSTOMERS, AND (B) CUSTOMERS IN ALL OTHER STATES WHERE THE COMPANY OPERATES)**

91.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

92.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Multistate Class defined above.

93.     Plaintiffs and the Class are parties to a contract with TWC setting forth the terms and conditions of their purchase of services from Defendant.

94.     Plaintiffs and the Class performed their obligations under the contract.

95.     In relevant part, TWC's customer contract, the Subscriber Agreement states:

> The **Customer Agreements** constitute the entire agreement between you and **TWC**.  You are not entitled to rely on any agreements or undertakings made by TWC personnel other than those contained in the **Customer Agreements.**

Ex. A, ¶20(a) (emphasis in original).

96.     Defendant TWC has breached its contract with Plaintiffs and the Class by, *inter alia*:

- Charging customers to lease old Company-provided modems, which are not "new" or "additional" equipment;

- Charging customers for Company-provided modems that were already in consumers' homes;

- Imposing added impermissible costs to promotional fixed set price plans by charging the Modem Lease Fee; and

- Violating its long-standing course of dealing with its customers under which it provided modems at no extra charge.

97.     In addition, and in the alternative, Defendant's breached its duty of good faith and fair dealing to Plaintiffs and the Class.

98.     Every contract contains an implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

99.     Implied in the terms of Defendant's contracts with Plaintiff and the Class was a covenant of good faith and fair dealing.  This implied covenant prevents TWC from engaging in conduct, and exercising its discretion, in bad faith, unreasonably, or in a manner inconsistent with consumers' reasonable expectations.

100.     TWC breached the implied covenant of good faith and fair dealing by charging Plaintiff and members of the Class for the old modems TWC had previously provided as part of consumers' TWC subscriptions.  Under the terms of the contract, to the extent TWC had the discretion to change the rates for old modems TWC exercised that discretion in bad faith.  TWC's failure to exercise its discretion in good faith is evidenced by TWC's recognition that most existing customers would not attempt to avoid the fee because these consumers would be intimidated by the complicated steps necessary to install their own modem.  TWC also knew prior to imposing the fee that existing customers would find the fee "surprising," and that consumers on fixed promotional price plans would think that the modem had been included in the promotional rate.  The reasons TWC gave consumers for implementing the fee were also false.  Further, the Modem Lease Fee rates TWC charged Plaintiffs and other members of the Class were outrageously high compared to the modem's negligible value and not reflective of TWC's actual modem-related costs.

101.     By reason of the forgoing, Plaintiffs and the Class have suffered monetary injuries and seek equitable relief including but not limited to, an order declaring that Defendant has breached its contract with Plaintiffs and the Class, and an order enjoining Defendant from charging customers the Modem Lease Fee.

## COUNT IV: PROMOTIONAL SET PRICE SUBCLASS – BREACH OF CONTRACT

### (ON BEHALF OF (A) NEW YORK AND CALIFORNIA CUSTOMERS, AND (B) CUSTOMERS IN ALL OTHER STATES WHERE THE COMPANY OPERATES)

102.    Plaintiffs Manwaring and Yoosefi re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

103.    Plaintiffs Manwaring and Yoosefi bring this claim on their own behalf and on behalf of each member of the Set Price Subclass defined above.

104.    Plaintiffs Manwaring and Yoosefi and the Class had set pricing plans from TWC.

105.    Plaintiffs Manwaring and Yoosefi and the Class performed their obligations under the contract.

106.    Defendant TWC breached its contract with Plaintiffs Manwaring and Yoosefi and the Class by charging a Modem Lease Fee that impermissibly raised the cost of the set price plans.

107.    By reason of the forgoing, Plaintiffs Manwaring and Yoosefi and other members of the Set Price Subclass have suffered monetary injuries and seek equitable relief including but not limited to, an order declaring that Defendant has breached its contract with Plaintiffs Manwaring and Yoosefi and the Set Price Subclass, and an order enjoining Defendant from charging set price customers for the Modem Lease Fee.

### COUNT V: UNJUST ENRICHMENT

### ON BEHALF OF (A) NEW YORK, NEW JERSEY, AND CALIFORNIA CUSTOMERS, AND (B) CUSTOMERS IN ALL OTHER STATES WHERE THE COMPANY OPERATES)

108.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

109.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Multistate Class defined above.

110.   As a result of Defendant's conduct, Defendant was enriched at the expense of Plaintiffs and the Class through the collection of the Modem Lease Fee.

111.   By collecting improper Modem Lease Fees from its customers, Defendant has benefited from receipt of these illicit fees, and under principles of equity and good conscience, Defendant should not be permitted to keep this money.

112.   As a result of Defendant's collection of the Modem Lease Fees, it would be unjust or inequitable for Defendant to retain the benefit without restitution to Plaintiffs and the Class. Accordingly, Defendant must account and make restitution to the Plaintiffs and the Class for its unjust enrichment.

## COUNT VI: OWNER SUBCLASS – BREACH OF CONTRACT

### (ON BEHALF OF (A) NEW YORK, NEW JERSEY, AND CALIFORNIA CUSTOMERS, AND (B) CUSTOMERS IN ALL OTHER STATES WHERE THE COMPANY OPERATES)

113.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

114.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Owner Subclass defined above.

115.   Defendant breached its contract with the Class by charging a Modem Lease Fee to TWC customers who bought and owned their modems before TWC started charging the lease fee as of October 2012.

116.   By reason of the forgoing, the Owner Subclass has suffered monetary injuries and seeks equitable relief including but not limited to an order declaring that Defendant has breached

its contracts with and the Owner Subclass, and an order enjoining Defendant from charging customers who have purchased and installed their own modems.

### COUNT VII: NEW YORK GENERAL BUSINESS LAW § 349

### (EQIUITABLE RELIEF ON BEHALF OF THE NEW YORK GBL SUBCLASS)

117.    Plaintiffs Damato, McLaughlin, McNally, Nasoff, Manwaring, and Nieves re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

118.    These Plaintiffs bring this claim on their own behalf and on behalf of each member of New York GBL Subclass.

119.    New York's Consumer Fraud Statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349.

120.    Defendant's Modem Lease Fee is consumer-oriented in that it is directed at members of the consuming public.

121.    By implementing and assessing the Modem Lease Fee on Plaintiffs and the other members of the New York GBL Subclass, Defendant engaged in, and continues to engage in, deceptive acts and practices in violation of New York's Consumer Fraud Statute.

122.    In particular, Defendant has violated New York's Consumer Fraud Statute by, *inter alia*:

    i)    labeling the modem fee a Modem Lease Fee when it really is not related to the value of consumers' modems;

    ii)    charging consumers the Modem Lease Fee for years before making service improvements;

    iii)    imposing unauthorized modem lease charges on the accounts of Plaintiffs and members of the New York GBL Subclass;

    iv)    charging customers a fee that is excessive when compared to the modems' negligible present value;

v)      charging customers a fee that bears no reasonable relationship to TWC's actual modem costs;

vi)     continuing to raise the price of the Modem Lease Fee on used modems that lose value each year and that TWC wrote off years ago;

vii)    giving consumers false justifications for the Modem Lease Fee;

viii)   failing to disclose that TWC knew the majority of its customers would be intimidated by the technical difficulties of buying and installing their own modem;

ix)     failing to disclose that the Modem Lease Fee is grossly in excess of the used modems' fair market value;

x)      failing to disclose that the Modem Lease Fee bears no reasonable relationship to TWC's actual modem costs; and

xi)     charging the Modem Lease Fee when it knew its customers would find the fee "surprising" and that customers on promotional plains would expect that the cost of the modem was included in the promotional rate.

123.    The aforementioned acts are unfair, unconscionable, and deceptive and are contrary to the public policy of New York which aims to protect consumers.

124.    Plaintiffs and the other members of the New York GBL Subclass seek equitable relief against Defendant.  Pursuant to the New York Consumer Fraud Statute, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices as alleged herein to be unlawful, an order enjoining Defendant from undertaking any further unlawful conduct, and an order directing TWC to make restitution to Plaintiffs and the New York GBL Subclass all Modem Lease Fee amounts wrongfully collected.

## COUNT VIII: NEW JERSEY CONSUMER FRAUD ACT

### (EQUITABLE RELIEF ON BEHALF OF THE NEW JERSEY CFA SUBCLASS)

125.    Plaintiff Lenett re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

126.    Plaintiff Lenett brings this claim on her own behalf and on behalf of each member of New Jersey CFA Subclass.

127.    The New Jersey Consumer Fraud Act (the "CFA") is a consumer protection statute designed to protect consumers from a wide variety of deceptive marketplace tactics. The CFA provides that that "[a]ny person who suffers any ascertainable loss . . . as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act, may bring an action . . . in any court of competent jurisdiction." N.J.S.A. § 56:8-19.

128.    N.J.S.A. 56:8-2 provides that "[t]he act, use or employment by any person of any unconscionable practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of material fact with the intent that others rely upon such concealment, suppression or omission . . . in connection with the sale or advertisement of any merchandise . . . is declared to be an unlawful practice."

129.    By implementing and assessing the Modem Lease Fee on Plaintiff Lenett and the other members of the New Jersey CFA Subclass, Defendant engaged in, and continues to engage in, unconscionable and deceptive practices in violation of the CFA.

130.    Defendant has violated the CFA by, *inter alia*:

    i)      labeling the modem fee a Modem Lease Fee when it really is not related to the value of consumers' modems;

    ii)     charging consumers the Modem Lease Fee for years before making service improvements;

    iii)    imposing unauthorized modem lease charges on the accounts of Plaintiffs and members of the New Jersey CFA Subclass;

    iv)    charging customers a fee that is excessive when compared to the modems' negligible present value;

    v)     charging customers a fee that bears no reasonable relationship to TWC's actual modem costs;

    vi)    continuing to raise the price of the Modem Lease Fee on used modems that lose value each year and that TWC wrote off years ago;

    vii)   giving consumers false justifications for the Modem Lease Fee;

viii)   failing to disclose that TWC knew the majority of its customers would be intimidated by the technical difficulties of buying and installing their own modem;

ix)   failing to disclose that the Modem Lease Fee is grossly in excess of the used modems' fair market value;

x)   failing to disclose that the Modem Lease Fee bears no reasonable relationship to TWC's actual modem costs; and

xi)   charging the Modem Lease Fee when it knew its customers would find the fee "surprising" and that customers on promotional plains would expect that the cost of the modem was included in the promotional rate.

131.   Plaintiff Lenett and other members of the New Jersey CFA Subclass further seek equitable relief against Defendant.  Pursuant to the CFA, this Court has the power to award such relief, including but not limited to, orders declaring Defendant's practices as alleged herein to be unlawful, enjoining Defendant from undertaking any further unlawful conduct, and directing TWC to make restitution to Plaintiff Ms. Lenett and the New Jersey CFA Subclass all Modem Lease Fee amounts wrongfully collected.

## COUNT IX: CALIFORNIA CONSUMERS LEGAL REMEDIES ACT

## (EQUITABLE RELIEF ON BEHALF OF THE CALIFORNIA SUBCLASS)

132.   Plaintiffs Maraquin, Yoosefi, and Brooks re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

133.   These Plaintiffs bring this claim on their own behalf and on behalf of each member of California Subclass.

134.   The California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* (the "CLRA"), prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

135.    The CLRA applies to Defendant's conduct because Defendant's conduct was intended to result, and did result, in the sale and lease of goods and services to Plaintiffs and the California Subclass.

136.    Defendant violated § 1770(a)(a)(5), (9), (14), and (16), by, *inter alia*:

i)     labeling the modem fee a Modem Lease Fee when it really is not related to the value of consumers' modems;

ii)    charging consumers the Modem Lease Fee for years before making service improvements;

iii)   imposing unauthorized modem lease charges on the accounts of Plaintiffs and members of the California Subclass;

iv)    charging customers a fee that is excessive when compared to the modems' negligible present value;

v)     charging customers a fee that bears no reasonable relationship to TWC's actual modem costs;

vi)    continuing to raise the price of the Modem Lease Fee on used modems that lose value each year and that TWC wrote off years ago;

vii)   giving consumers false justifications for the Modem Lease Fee;

viii)  failing to disclose that TWC knew the majority of its customers would be intimidated by the technical difficulties of buying and installing their own modem;

ix)    failing to disclose that the Modem Lease Fee is grossly in excess of the used modems' fair market value;

x)     failing to disclose that the Modem Lease Fee bears no reasonable relationship to TWC's actual modem costs; and

xi)    charging the Modem Lease Fee when it knew its customers would find the fee "surprising" and that customers on promotional plains would expect that the cost of the modem was included in the promotional rate.

137.    Defendant also violated § 1770(a)(19) by later amending its contracts with Plaintiffs and the California Subclass and inserting language that purportedly permits TWC to charge the Modem Lease Fee, which is unconscionable.

138.    As a result of Defendant's violations of the CLRA, Plaintiffs the California Subclass were wrongfully charged the Modem Lease Fee.

139.     By reason of the foregoing, Plaintiffs and members of the California Subclass seek an injunction requiring Defendant to stop charging Plaintiffs and the California Subclass for Modem Lease Fees.

### COUNT X: CALIFORNIA UNFAIR COMPETITION LAW

### (EQUITABLE RELIEF ON BEHALF OF THE CALIFORNIA SUBCLASS)

140.     Plaintiffs Maraquin, Yoosefi, and Brooks re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

141.     These Plaintiffs bring this claim on their own behalf and on behalf of each member of the California Subclass.

142.     Cal. Bus. & Prof Code § 17200, *et seq.* (the "UCL") prohibits acts of "unfair competition," including any unlawful and unfair business acts or practices.

143.     Under the "unlawful" prong of the UCL, a violation of another law is treated as unfair competition and is independently actionable.

144.     Defendant committed unlawful practices because it violated the CLRA.

145.     Defendant also committed unlawful practices because it violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a), which declares unlawful unfair and deceptive acts or practices in or affecting commerce.  Defendant's conduct as is both unfair and deceptive.

146.     Plaintiffs and the California Subclass reserve the right to allege other violations of law which constitute other unlawful business acts or practices as Defendant's conduct is ongoing and continues to this date.

147.     Under the "unfair" prong of the UCL, a business practice is unfair if that practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

148.     Defendant committed unfair acts and practices by, *inter alia*:

i)   labeling the modem fee a Modem Lease Fee when it really is not related to the value of consumers' modems;

ii)   charging consumers the Modem Lease Fee for years before making service improvements;

iii)   imposing unauthorized modem lease charges on the accounts of Plaintiffs and members of the California Subclass;

iv)   charging customers a fee that is excessive when compared to the modems' negligible present value;

v)   charging customers a fee that bears no reasonable relationship to TWC's actual modem costs;

vi)   continuing to raise the price of the Modem Lease Fee on used modems that lose value each year and that TWC wrote off years ago;

vii)   giving consumers false justifications for the Modem Lease Fee;

viii)   failing to disclose that TWC knew the majority of its customers would be intimidated by the technical difficulties of buying and installing their own modem;

ix)   failing to disclose that the Modem Lease Fee is grossly in excess of the used modems' fair market value;

x)   failing to disclose that the Modem Lease Fee bears no reasonable relationship to TWC's actual modem costs; and

xi)   charging the Modem Lease Fee when it knew its customers would find the fee "surprising" and that customers on promotional plains would expect that the cost of the modem was included in the promotional rate.

149.   Defendant's acts and practices are unfair because the gravity of the consequences of Defendant's conduct as described above outweighs any justification, motive or reason, particularly considering the available legal alternatives which exist for Defendant to increase its revenues.  Defendant's acts and practices are also immoral, unethical, unscrupulous, and offend established public policy and are substantially injurious to Plaintiffs and the other members of the California Subclass and could not have been reasonably avoided by Plaintiffs and the California Subclass.

150.   Plaintiffs and the other members of the California Subclass are entitled to an order pursuant to Cal. Bus.  & Prof Code §17203 enjoining Defendant's unlawful and unfair conduct,

and such other orders and judgments necessary to disgorge Defendant's ill-gotten gains and to order restitution to Plaintiffs and the California Subclass any amounts paid for the Modem Lease Fee as a result of Defendant's wrongful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)    Issue an order certifying the Classes defined above, appointing the Plaintiffs as Class representatives, and designating the undersigned firms as Class Counsel;

(b)    Render a Declaratory Judgment that Defendant has breached its contracts with Plaintiffs and the Class;

(c)    Render a Declaratory Judgment that Defendant has been unjustly enriched and must make restitution to Plaintiffs and the Class;

(d)    Issue an injunction prohibiting Defendant from charging the Modem Lease Fee;

(e)    Issue an order granting declaratory judgment and injunctive relief pursuant G.B.L. §349 on behalf of the New York GBL Subclass;

(f)    Issue an order granting declaratory judgment and injunctive relief pursuant to N.J.S.A. 56:8-1, *et seq.* on behalf of the New Jersey CFA Subclass;

(g)    Issue an order granting injunctive relief pursuant to Cal. Civ. Code §1780 on behalf of the California Subclass;

(h)    Issue an order granting restitution and injunctive relief pursuant to Cal. Bus. & Prof Code §§17200, *et seq.* on behalf of the California Subclass;

(i)    Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(j)    Grant all such other relief as the Court deems appropriate.

Dated: July 31, 2016
      Armonk, New York

**WITTELS LAW, P.C.**

By:  /s/ Steven L. Wittels            _

        Steven L. Wittels (SLW-8110)
        J. Burkett McInturff (JBM-4564)
        Tiasha Palikovic (TP-5697)
        18 HALF MILE ROAD
        ARMONK, NEW YORK 10504
        Telephone: (914) 319-9945
        Facsimile:  (914) 273-2563
        slw@wittelslaw.com
        jbm@wittelslaw.com
        tpalikovic@wittelslaw.com

        *Counsel for Plaintiffs and the Class*

        **THE ROTH LAW FIRM, PLLC**
        Richard Roth
        295 MADISON AVENUE, 22ND FLOOR
        NEW YORK, NEW YORK 10017
        Telephone: (212) 542-8882
        Facsimile:  (212) 542-8883
        rich@rrothlaw.com

        *Co-Counsel for Plaintiffs and the Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing was filed electronically this 31st day of July, 2016. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>/s/  Steven L. Wittels   </u>
Steven L. Wittels